Stanley M. JANIKOWSKI, Plaintiff,

v.

The BENDIX COMPANY, Defendant.

No. 83–CV–5187.

United States District Court,
E.D. Michigan, S.D.

March 11, 1985.

---

George B. Washington, Detroit, Mich., for plaintiff.

Thomas G. Kienbaum, and Michael A. Alaimo, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

The question presented here is whether the plaintiff's claim for unlawful age discrimination in employment is barred by the applicable statutes of limitations.

In this case, the plaintiff, Mr. Stanley M. Janikowski, 52, had been employed in various executive positions with the defendant's corporation since September 1, 1971. Plaintiff is a Pennsylvania resident. The defendant is a Delaware corporation doing business in Michigan.

Jurisdiction in this matter is predicated on diversity, 28 U.S.C. § 1332 and 29 U.S.C. § 621 et seq., the Age Discrimination in Employment Act. Plaintiff also alleges a state claim under the Michigan Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq.

Since his hire by defendant, plaintiff served in its taxation department. On September 4, 1980, plaintiff was advised by the director of the tax department that his employment with that division would be terminated by September 30, 1981 because of a reduction in defendant's workforce. A written memo dated November 18, 1980 confirmed this termination notice. Plaintiff's employment with Bendix was actually terminated on November 30, 1981.

About six months after his termination, on May 24, 1982, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC), charging unlawful age discrimination. On March 28, 1983, the EEOC notified plaintiff that it would not proceed further on his complaint. Thereafter, plaintiff commenced the present suit on November 28, 1983.

This matter is now before the court on defendant's motion for summary judgment or dismissal. It is defendant's position that plaintiff's claims under both statutes are barred under their respective statute of limitations periods. Oral arguments were

originally held on defendant's motion on October 29, 1984. During the arguments, plaintiff contended that he was the victim of "continuing" discrimination by the Bendix Corporation. Because this new argument was not addressed in the parties' briefs, supplementary briefing was ordered and additional oral arguments were heard.

A motion for summary judgment may be granted when there is no genuine issue of a material fact, and the movant is entitled to judgment as a matter of law. Fed.R. Civ.P. 56. The court must construe the evidence together with all inferences in the light most favorable to the party opposing the motion. *Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*, 630 F.2d 1155 (6th Cir.1980); *Bohn Aluminum & Brass Corp. v. Storm King*, 303 F.2d 425 (6th Cir.1962).

### 1. *ADEA Claim*

There is no dispute regarding the applicable law or length of the limitations period concerning plaintiff's ADEA claim. The Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., provides, in pertinent part,

> No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Secretary. Such a charge shall be filed:
> (1) within 180 days after the alleged unlawful practice occurred; or
> (2) in a case to which section 14(b) applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

29 U.S.C. § 626(d).

This section of the ADEA refers to section 14(b) of the same statute. Under section 14(b), the 300 day limitation period is applicable in those states with a similar age discrimination statute. The Elliott-Larsen Act, *supra,* is a comparable statute under section 633(b). Therefore, the parties agree that plaintiff was required to file a charge with the EEOC within 300 days after the discrimination which is alleged.

Plaintiff makes two arguments—though interwoven—in opposition to defendant's motion. Initially plaintiff argues that it was never made clear exactly when his employment with the Bendix Corporation would be terminated. In a related argument, plaintiff suggests a "continuing violation" by defendant in first terminating him from its taxation department, and then refusing to hire him for other positions within the corporation. The continuing violation argument is based on the theory that although plaintiff was terminated from the taxation department, he was not terminated from the corporation itself until his actual discharge on November 30, 1981.

First, the issue of when plaintiff received notice of his termination must be considered. A leading case in this area, as both parties concede, is *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In *Ricks*, a college professor was denied tenure by the trustees of a state college. After the trustees made its denial of tenure decision, it wrote the plaintiff a letter, dated June 26, 1974, stating that he would be offered a one-year "terminal contract" and that his employment with the college would terminate on June 30, 1975. The professor had earlier filed a grievance regarding the trustees' decision. Several months after this June 26, 1974 notice, the professor's grievance was denied.

The professor attempted to file a discrimination complaint with the EEOC on April 4, 1975. After a right-to-sue letter was issued by the EEOC, the professor's action was dismissed by the district court as not being timely because the EEOC charge was not within 180 days of the alleged unlawful employment practice—June 26, 1974—when the professor was notified that his contract would not be renewed and that he was denied tenure. 449 U.S. at 254–55, 101 S.Ct. at 502.

The Supreme Court held that the relevant inquiry in determining the timeliness

of the professor's EEOC complaint was "to identify precisely the 'unlawful employment practice' of which he complains." *Id.* at 257, 101 S.Ct. at 504. The Court said: "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* Because termination of his employment was a "delayed but inevitable, consequence of the denial of tenure," the Court held:

> In sum, the only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks [the professor]. 'The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful.' [*citing Abramson v. Univ. of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979) ].

*Id.* at 258, 101 S.Ct. at 504.

Subsequently, in *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), the plaintiffs brought a civil rights action against their employer. Relying on *Ricks,* the Court ruled that the statute of limitations began to run, not on the designated date on which employment ceased, but rather when respondents were notified by letter that "a final decision had been made to terminate their appointments." 454 U.S. at 8, 102 S.Ct. at 29. "[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." *Id.*

Applying the guidelines set forth in *Ricks* and *Chardon* to the present case, this court must determine when the termination decision was made and the plaintiff notified of the decision. The defendant takes the position that plaintiff was informed of his termination on September 4, 1980. On that date, plaintiff met with John Doyle, his supervisor, and Ron Weinel, director of defendant's tax department. Plaintiff's Deposition at 87–88. According to plaintiff's deposition, the meeting went as follows:

Q: [Defendant's counsel] Mr. Janikowski, on what date was your employment with Bendix terminated?

A: November 30, 1981.

Q: And who was the person who told you that you were terminated, or who told you that your employment with Bendix was terminated?

A: That would have been Ron Weinel.

Q: When did Mr. Weinel first indicate to you that you were to be terminated?

A: I guess around September of 1980, or thereabouts.

Q: Was there a meeting with Mr. Weinel?

A: With Ron Weinel and John Doyle, yes.

. . . . .

Q: As precisely as you can, can you tell us what Mr. Weinel told you at that meeting on September 4, 1980?

A: Basically, what he said here in the memo, that the special project status that had been assigned to me would possibly be eliminated and at that time he did not perceive any other openings within the department, nor was he anticipating any in the near future.

Q: Did he suggest you begin looking for other employment?

A: Yes, to continue to search both within and outside the company.

Q: Did he tell you anything else at that September 4th meeting?

A: It was a very short type of meeting, very, very quick.

Q: [referring to the September 4, 1980 meeting] Were you surprised?

A: I was shocked. I couldn't believe it.

Q: Why was that?

A: Have you ever received notice of termination? You don't have to answer that question. That was the first time in my life I had ever received any kind of notification of being terminated from any kind of position.

. . . . .

Q: What I'm getting at, you just stated you were surprised because generally

you had just never been terminated from a position that you held. Were you specifically surprised about the fact that you were being terminated at Bendix?

A: Absolutely.

Deposition at 88–89.

Additionally, defendant points to the November 18, 1980 memo sent to plaintiff from Mr. Weinel. The memo apparently reiterates the contents of the September 4, 1980 meeting between plaintiff and his supervisors. The memo states, in pertinent part:

[Y]our employment with the Bendix Tax Department will cease not later than September 30, 1981. If on the date of your termination from the Tax Department you have not secured a position elsewhere within Bendix, you will be terminated from employment.

The memo further says,

Therefore, I strongly urge you to initiate an immediate search, both within and outside Bendix, for alternative employment.

I can assure you that under no circumstances can I envision your employment within the Bendix Tax Department continuing beyond September 30, 1981, and that the possibility exists that the function you currently perform will be eliminated before that date. Therefore, I encourage you not to ignore prospective employment opportunities ...

Under defendant's argument, plaintiff was given notice of termination on September 4, 1980 in his meeting with Messrs. Doyle and Weinel. Because the EEOC complaint was not filed until May 24, 1982, it is defendant's position that 626 days lapsed from the notice date—thus barring plaintiff's ADEA claim against Bendix.

Plaintiff's response is that neither the September 4, 1980 meeting nor the November 18, 1980 memo made clear that plaintiff's job with the Bendix Corporation was terminated. Plaintiff contends that the limitations period began on November 30, 1981 when he was actually terminated by defendant. Because his EEOC complaint was filed on May 24, 1982, plaintiff argues it was well within the 300 day period.

In support of his position, plaintiff relies on language in *Ricks, supra,* regarding the definiteness of the termination notice. In *Ricks,* the Court noted that the terminal contract offered to the professor had "explicit notice that his employment would end upon its expiration." 449 U.S. at 258, 101 S.Ct. at 504. Plaintiff states that the notice given him on September 4, 1980 "clearly left open the possibility that Janikowski would be employed 'inside' Bendix ..."

Moreover, plaintiff cites two recent district court decisions, *Cohen v. Board of Education,* 536 F.Supp. 486 (S.D.N.Y. 1982), and *Leite v. Kennecott Copper Corp.,* 558 F.Supp. 1170 (D.Mass.1983), for the proposition that "equivocal or unclear notices that a person might be terminated would not cause the statute of limitations to run." In *Cohen,* a teacher challenged her termination by filing a civil rights claim against the school district. The court said: "Until plaintiff received notification of the Board's action, her injury was only a possibility. Therefore, I find that ... [c]laims accrued when plaintiff was notified on ..." 536 F.Supp. at 493.

Far more instructive is the *Kennecott Copper* case. In that case, six employees filed ADEA claims against their employer. The employer moved for summary judgment on the ground that all the employee's claims were time barred by the three-year statute of limitations on "willful" violations. The court, relying on *Chardon, supra,* held that the actual date of discharge does not control the statute of limitations trigger. 558 F.Supp. at 1172.

Although notice of termination need not be in written form in order to trigger the limitations period, it must unambiguously indicate that a final termination decision has been reached. The Court in *Chardon,* for example, although it did not discuss what degree of clarity may be required, indicated that the written notices there informed the respondents

that a final decision had been made to terminate their appointments.

*Id.* at 1174 [citations omitted]. Based on this, the *Kennecott* court determined that "unofficial notice" by the employer was not sufficient enough to start the statute of limitations period. The court said the issue of whether the oral notice provided to the employees "possessed the requisite clarity" would be considered at trial. *Id.* at 1174.

■ Although plaintiff in the present case asserts that the statements made at the September 4, 1980 meeting and the November 8, 1980 memo were unclear and that termination was contingent on plaintiff finding another position within the Bendix Corporation, the plaintiff's own deposition testimony belies such an argument. As noted *supra*, the plaintiff stated: "This was the first time in my life I had ever received any kind of notification of being terminated from any kind of position." Plaintiff's Deposition at 89. Plaintiff admitted that he knew he was terminated from his position. Under *Ricks* and its progeny, the September 4, 1980 meeting was the point at which the 300 day time period for an EEOC filing was triggered under section 14(b) of the ADEA. Therefore, on this date, plaintiff was required to file a charge with the EEOC within 300 days. As the Court in *Chardon* stated:

> [T]he proper focus is on the time of the *discriminatory act*, [emphasis in original] not the point at which the consequences of the act becomes painful. The fact of termination is not itself an illegal act.... As we noted in *Ricks*, 'mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination'. In the cases at bar, respondents were notified, when they received their letters, that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suits may be filed.

454 U.S. at 8, 102 S.Ct. at 29. The plaintiff's own deposition testimony leaves little doubt that he knew on September 4, 1980 that he was terminated.

The next issue which arises is plaintiff's "continuing violation argument." Plaintiff apparently argues that his termination in the Fall of 1980 was from the defendant's tax department only, and not from the entire corporate structure of Bendix. This, of course, opens the door to the continuing violation argument. Because there is little doubt that plaintiff knew he was terminated on September 4, 1980, the continuing violation argument he advances is critical if he is to defeat defendant's summary judgment motion.

The crux of plaintiff's continuing violation argument is that although plaintiff may have known that he was terminated from the taxation department on September 4, 1980, he was not terminated from Bendix itself at that time. After termination from the taxation department, plaintiff argues, he was the subject of continuing age discrimination until he was actually terminated from the Bendix Corporation on November 30, 1981. Under this theory, plaintiff's EEOC filing—on May 24, 1982— would have been within the statutory 300-day period and his claim would not be barred.

According to plaintiff's pleadings and deposition, he was denied a number of positions within the Bendix Corporation after notice of termination from the taxation department. Plaintiff's Deposition at 100–112. Plaintiff contends that Bendix's failure to allow him to transfer to another division of the corporation was based on unlawful age discrimination. Specifically, there are four job opportunities within Bendix that plaintiff alleges were denied him based on his age. These opportunities, outlined in Deposition Exhibit # 13, were (1) assistant director of management audit services (Spring '80); (2) regional audit manager for Warner & Swasey (Summer '80); (3) assistant director of special projects (Spring '81); (4) position on group controller's staff on Bendix Industrial Group (Summer '81).

The continuous violation doctrine was discussed by the Supreme Court in *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). This doctrine is usually applied in situations involving patterns or practices of discrimination, such as maintaining discriminatory hiring practices, placement, promotion systems, or the like.

In *Evans*, plaintiff was an airline flight attendant during a period when United Airlines would not employ married flight attendants. When plaintiff married she was forced to resign. This no-marriage policy was eventually held to contravene Title VII and was abolished by the airline. Four years after the no-marriage policy was eliminated, plaintiff resumed working for United. During her second term with United, the airlines refused to accord her any seniority or benefits for her earlier employment. The Supreme Court rejected plaintiff's argument that she was the subject of a "continuing violation of Title VII." The Court said:

> United's seniority system does indeed have a continuing impact on her [plaintiff's] pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* [emphasis in original] exists. She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently from former employees who resigned or were discharged for a non-discriminatory reason.

*Id.* at 558, 97 S.Ct. at 1889.

More recently in the *Ricks* case, discussed *supra*, the Supreme Court spoke to the continuing violation doctrine. The college professor in *Ricks* claimed that after he was informed he was being placed on a one-year terminal contract, the limitations period for filing a complaint did not start until the expiration of his contract, because the university was committing a continuing violation against him. The Court rejected this argument.

Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. *United Air Lines v. Evans, supra* [431 U.S.], at 558 [97 S.Ct. at 1889]. If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.

*Id.*, 449 U.S. at 257, 101 S.Ct. at 504. In the complaint in *Ricks*, sixteen paragraphs detailed the tenure denial decision, but only one paragraph discussed the plaintiff's leaving the university, and there were no other allegations suggesting discrimination. *Id.* at n. 8.

The Court stressed that in order for the professor to prove that the limitations period commenced at the date of discharge, he would have to "allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure." *Id.* at 258, 101 S.Ct. at 504. In concluding, the Court reiterated the statement that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." The Court continued: "The emphasis is not upon the effects of earlier employment decisions; rather, it is [upon] whether any present *violation* exists." [emphasis in original]. *Id.*

A considerable body of caselaw has developed within the Sixth Circuit on the continuing violation theory. In *Roberts v. North American Rockwell*, 650 F.2d 823, 827–28 (6th Cir.1981) *rehr'ing & rehr'ing en banc denied*, (1981), the Sixth Circuit stated that the continuing violation doctrine provides that where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred. Within the *Roberts* framework, however, it is clear that the continuing effect of an alleged act of dis-

crimination is not sufficient—the crucial inquiry is whether there is a present violation. *United Airlines, Inc. v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1888–89, 52 L.Ed.2d 571 (1977); *Trabucco v. Delta Airlines,* 590 F.2d 315, 316 (6th Cir.1979) (per curiam).

The test, simply stated, is whether the plaintiff timely filed a charge of a present violation which is part of an ongoing pattern of discrimination. *Roberts,* 650 F.2d at 828, *Curry v. United States Postal Service,* 583 F.Supp. 334 (S.D.Ohio 1984). In applying this test, several recent Sixth Circuit cases are instructive. In *EEOC v. McCall Printing Corp.,* 633 F.2d 1232 (6th Cir.1980), several black employees sued the defendant for race discrimination. In rejecting a continuous violation argument, Judge Kennedy wrote that residual effects of alleged discrimination which may still be felt through a seniority system does not render the alleged discrimination continuous under the *Evans* rule. "Repeated requests for further relief from a prior act of discrimination will not set the time limitations running anew." *Id.* at 1237, citing *Goldman v. Sears,* 607 F.2d 1014 (1st Cir. 1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980).

In *Hall v. Ledex, Inc.,* 669 F.2d 397 (6th Cir.1982), the court gave an example of a continuing violation. In that case, the plaintiff worked as an office clerk and was promoted to "expeditor." Plaintiff's immediate predecessor held the job under the title "Production Control Coordinator." When the predecessor quit, the company reclassified the job and offered it to plaintiff at a salary lower than what her predecessor had received. The evidence showed that plaintiff assumed all of her predecessor's duties and more. In her sex discrimination suit, the plaintiff's continuing violation argument was accepted by the court. The court held that although she filed her EEOC complaint 330 days after her so-called "promotion," her complaint was not barred because the company's sex discrimination against plaintiff was "continuing." The court said: "[T]he discrimination was continuing in nature. Hall suffered a deni-

al of equal pay each check she received." The Sixth Circuit relied on the *Roberts* case and several decisions of other circuits. *Id.* at 398–99.

In one further case, *Kinniry v. Aetna,* 35 FEPC (BNA) 1474 (D.C.Conn.1984), a district court in Connecticut rejected the continuing violation theory. A 61-year-old former Aetna vice president filed suit for age discrimination. His specific allegations were failure to promote, discriminatory compensation, and forced retirement along with a general allegation about Aetna's policy of age discrimination.

Kinniry's continuing violation argument was grounded in his contention that Aetna did not revoke its termination or act upon his request for reinstatement. This argument was rejected by the court:

> [I]t is insufficient for Mr. Kinniry to claim that Aetna's failure to rescind the termination decision gives present effect to the termination decision itself. Such an argument would do away with the limitations period in all cases in which an employee who suffered a discriminatory firing was not rehired. Whatever the merits, such a policy was not adopted by Congress in section 7(d) of the ADEA.

35 FEPC (BNA) at 1477.

The lessons of these cases must now be applied to Mr. Janikowski's situation. The complaint in this case does not, at least clearly or by reasonable inference, allege any sort of continuing violation. His termination from the taxation department is the sole event he complains of.

■ If plaintiff's continuing violation argument is to hold up, plaintiff's termination from the tax department, along with defendant's subsequent refusals to hire plaintiff in any other capacity, must have been part of a policy, pattern, or of on-going discrimination by Bendix Corporation. The *Ricks* court stated: "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." The focus in a continuing violation action is: "not upon the effects of earlier employment decisions;

rather it is whether any present violation exists." *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504.

Because plaintiff urges that the time at which the 300-day limitations period commenced was upon his actual termination on November 30, 1981, he must show that the discriminatory practice simply manifested itself when he was notified by the company on September 4, 1980, and that the discriminatory policy or practice continued through the subsequent job rejections and up until his actual employment termination from Bendix.

Plaintiff's continuing violation argument, however, is inconsistent with his own complaint and does not square with existing caselaw. In making the relevant inquiry— whether plaintiff timely filed a charge of a present violation which is part of an ongoing pattern of discrimination—there is a shortcoming to plaintiff's position.

Plaintiff fails to show that the defendant's failure to hire him after the September 4, 1980 termination notice was part of a discriminatory pattern or continuing violation. In fact, the four separate employment opportunities plaintiff applied for seemed to be exactly that—four isolated and discrete job openings for which he was rejected. Plaintiff has not produced any evidence to even suggest that his subsequent application and rejection from these four positions were other than separate and distinct employment decisions. The uncontradicted evidence shows that plaintiff is attempting to label his September 4, 1980 termination notice a continuing violation without proferring any evidence whatsoever that defendant engaged in a pattern of discrimination or employment practice.

■ In sum, plaintiff alleges that defendant engaged in continuous discrimination but is unable to provide evidence or show any act or acts of continuing discrimination. The September 4, 1980 oral termination from the taxation department was Bendix's final word on plaintiff's employment status unless he was able to secure other employment with the corporation. Although not expressly argued, plaintiff's implied position is that defendant's failure to offer him another position or rehire him was a continuing violation. This argument, as noted, has been rejected by other courts. *Lawson v. Burlington Industries*, 683 F.2d 682, 684 (4th Cir.1982) ("[A]n employer's failure to recall or rehire does not constitute a continuing violation of the ADEA"); *Shultz v. Dempster Systems, Inc.*, 561 F.Supp. 1230 (E.D.Tenn.1983) (Taylor, C.J.) (citing and relying upon *Lawson, supra* ).

Therefore, plaintiff has failed to show a continuing violation, but rather complains of separate and discrete acts of discrimination. Under these circumstances, plaintiff's ADEA claim is barred by the 300-day limitations period.

## 2. *State Law Claim*

Next, defendant contends that plaintiff's claim under the Elliott-Larsen Act, MCL § 37.2101 et seq., is barred by the applicable statute of limitations. Both parties agree that the statute of limitations under this act is three years. *Vandenhout v. Manchester Plastics, Inc.*, 43 F.E.P. 826 (E.D.Mich.1982) (Joiner, J.). There is a serious dispute, however, as to when the plaintiff's cause of action accrued under Elliott-Larsen.

Plaintiff, relying primarily on *Department of Civil Rights ex rel. Zlotogura v. City of Muskegon*, 100 Mich.App. 557, 298 N.W.2d 760 (1980), argues that his claim accrued on November 30, 1981 which was the date of his actual discharge. Because the present suit was filed on November 28, 1983, the action would have been commenced within the three year limitations period if plaintiff's argument is accepted. *Zlotogura* involved a situation in which the plaintiff sought employment from defendant in July of 1973. A younger applicant was hired by defendant on September 5, 1973. Under the Michigan Fair Employment Practices Act, since repealed, plaintiff as an aggrieved claimant was required to file a complaint within 90 days of the alleged discriminatory act. M.C.L. § 423.-

307(b). The court held that plaintiff's claim accrued on September 13, 1973 when the new employee actually began work, and not when plaintiff was refused hire. 100 Mich.App. at 560, 298 N.W.2d 760.

In reaching its conclusion, the court in *Zlotogura* relied on three federal cases which considered this issue: *Egelston v. State Univ. College a Genesco,* 535 F.2d 752 (2d Cir.1976); *Noble v. Univ. of Rochester,* 535 F.2d 756 (2d Cir.1976); and the appellate ruling in *Ricks v. Delaware State College, supra.* The court stated:

> The rationale underlying these decisions is that a seemingly final decision may be reconsidered and sometimes reversed and it is not desirable to encourage the initiation of litigation which could preclude the possibility of reconsideration; and more importantly from a practical point of view, a rule which requires an employee actually to cease or begin employment in order to trigger the running of the statutory limitation period serves as a bright guideline for both the courts and the victims of discrimination.
>
> We are persuaded that the rationale of the foregoing cases is applicable with equal validity to cases arising under Michigan's Fair Employment Practices Act....

100 Mich.App. at 560, 298 N.W.2d 760.

After the *Zlotogura* decision was rendered, several subsequent court rulings shed doubt on its applicability to the present case. The Third Circuit's ruling in *Ricks,* which was relied upon in *Zlotogura,* was reversed by the United States Supreme Court. As defendant correctly notes, the other two cases relied on in *Zlotogura, Egelston* and *Noble,* [1] were "of the same ilk." Further, the United States Supreme Court issued its opinion in *Chardon, supra,* one year after *Zlotogura.*

Based on these developments, defendant contends that the underpinnings of the *Zlotogura* ruling have been "swept away," and their relevance to the instant case is tenuous at best.

Plaintiff attempts to counter this argument by citing the case of *Northville Schools v. Civil Rights Commission,* 118 Mich.App. 573, 325 N.W.2d 497 (1982), as reaffirming *Zlotogura* despite the reversal of the appellate's court ruling in *Ricks.* Plaintiff's reliance on *Northville,* however, is less than persuasive. In that case, a sex discrimination claim was made under the Michigan Fair Employment Practices Act, M.C.L. § 423.301 et seq. As a point of information, this Act was repealed on March 31, 1977, and the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. was subsequently enacted. The complainant, a teacher, notified her employer that she was pregnant and intended to use her sick leave and personal days for the time she would be missing for the childbirth and recuperation. The school board refused to allow the teacher to do this—and instead offered her a temporary leave of absence without pay, pursuant to school policy. The teacher later challenged the school's procedure by filing a claim with the Department of Civil Rights. The Court of Appeals noted that since its earlier ruling in *Zlotogura,* that the *Ricks* case had been reversed by the Supreme Court. Importantly though, the court stated that *Ricks* was distinguishable from the *Northville* case.

The distinction drawn was that in *Ricks* the college had a policy under which a faculty member who had been denied tenure was not discharged immediately, but given a one year terminal contract. Under these circumstances, the limitation period began to run when tenure was denied, and not when employment was actually termi-

---

1. In *Egelston*—the Second Circuit held that the statutory limitation period with a sex discrimination claim began to run when the claimant discontinued her teaching functions and not when she was notified that her contract would be terminated. Additionally, the court noted that the limitations could also be triggered, possibly, when her replacement was hired.

In *Noble*—another sex discrimination case, the Second Circuit held that a promotion was not consummated until the employee "took actual command of [his duties] ... and the time limit was not triggered until then" regardless of when the promotion decision was made and the parties advised of such a decision.

nated. In contrast, the *Northville* case was distinguished:

> Under MCL 423.307(b) [repealed Fair Employment Practices Act], the limitation period began 'after the alleged act of discrimination.' It is an act of discrimination which starts the running of the limitation period, not a mere threat to discriminate or an announcement of an intention to discriminate. Here the essence of claimant's claim is that she was forced to take leave without pay rather than sick leave with pay. The act of discrimination thus occurred at the time when claimant would have been paid for the sick leave days had claimant been permitted to take sick leave with pay.

118 Mich.App. at 579, 325 N.W.2d 497. Based on *Northville*, therefore, plaintiff asserts that *Zlotogura* was reaffirmed and that the controlling principle is: "It is an act of discrimination which starts the running of the limitation period, not a mere threat to discriminate or an announcement of an intention to discriminate." 118 Mich. App. at 579, 325 N.W.2d 497. Plaintiff, in the instant case, argues that the act of discharge on November 30, 1981 was the "act of discrimination" and that since the lawsuit was filed on November 28, 1983, the three year period has not run.

Plaintiff's argument extends *Northville* further than the court intended. A crucial distinction is that *Northville* involved a benefit policy scenario and not an employment termination situation. Therefore, if the *Ricks-Chardon* rationale is applied to *Northville*, the discriminatory act would occur when the sick leave policy was announced and all claims based on the policy would accrue at that point. But in *Northville*, the court stated that the crucial time is when the policy is actually applied to an individual and not when first announced.

Beyond this distinction between *Northville* and the present case, a recent Michigan Court of Appeals ruling is especially important. In *Robson v. General Motors Corp.*, 137 Mich.App. 650, 357 N.W.2d 919 (1984), the court applied the *Chardon-Ricks* rule in a case arising under one of Michigan's civil rights laws, the Michigan Handicappers' Civil Rights Act, M.C.L. § 37.1101 et seq. In *Robson*, the plaintiff contracted polio as a child and underwent several back operations. In 1965 plaintiff began his employment with General Motors as a test driver. In December of 1978 plaintiff was taken off test driving duties after a routine physical examination. Plaintiff continued in defendant's employ until February 12, 1982 when he was laid off. Alleging employment discrimination because of his physical handicap, plaintiff filed suit against General Motors on June 14, 1982.

The trial court granted defendant's motion for accelerated judgment and held that plaintiff's claim was barred by the applicable statute of limitations. A three year statute of limitations is applied under the handicapper's act. M.C.L. § 600.5805(8). The crucial date for plaintiff's claim, according to the trial court, was the time at which plaintiff was removed from his test driving duties and not when terminated, 137 Mich.App. at 653, 357 N.W.2d 919, and therefore the court held plaintiff's claim was filed too late.

In affirming the trial court's determination, the Michigan Court of Appeals stated that the limitations period "begins to run with the discriminatory act, not with the employer's subsequent failure to change its mind." 137 Mich.App. at 655–56, 357 N.W.2d 919. Accordingly, the court reasoned that any changes in the terms or conditions of plaintiff's employment after he was removed as a test driver were "mere consequences of effects" of the defendant's earlier decision. The court analogized the defendant's failure to reinstate the plaintiff or change the conditions of his employment to those terminations in *Ricks, Chardon,* and *Evans, supra.* Said the court: "*Ricks* and *Chardon* show that the limitations period begins to run with the discriminatory act, not with the employer's subsequent failure to change its mind." *Id.* at 655–56, 357 N.W.2d 919.

Because Michigan courts view federal precedent as highly persuasive, the import

of *Robson* is clear. The focus must be on the time of the discriminatory act and not with subsequent refusals of an employer to change a decision it made earlier. The court in *Robson* stated:

> Requests for relief from a prior discriminatory act will not start the limitations period running anew. *Equal Employment Opportunity Comm. v. McCall Printing Corp.*, 633 F.2d 1232, 1237 (6th Cir.1980). A contrary rule would permit a plaintiff to circumvent the statute of limitations and revive a cause of action by merely requesting the employer to undo its past acts.

137 Mich.App. at 656, 357 N.W.2d 919.

As noted *supra*, the alleged discriminatory act by the defendant in the present case occurred at the September 4, 1980 meeting with his supervisors. The deposition testimony of plaintiff states that he knew at that time he had been terminated from his position in defendant's taxation department. Any decision by the defendant not to rehire or transfer plaintiff to another division of its corporation cannot prolong the life of plaintiff's cause of action. *Chardon*, 454 U.S. at 8, 102 S.Ct. at 29. The alleged discriminatory act had taken place, plaintiff was fully aware of it, and therefore, the applicable statute of limitations began to run.

Because plaintiff filed his suit on November 28, 1983, more than three years after the discriminatory act, this court must conclude that the statute of limitations has run on the Elliott-Larsen claim.

Plaintiff's complaint, therefore, must be dismissed as being barred by the applicable statutes of limitations.

IT IS SO ORDERED.